

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-9-2001

# Marshak v. Treadwell

Precedential or Non-Precedential:

Docket 99-5614

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Marshak v. Treadwell" (2001). *2001 Decisions.* Paper 25.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/25

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 9, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No: 99-5614

LARRY MARSHAK,

        Appellant

v.

FAYE TREADWELL; TREADWELL DRIFTERS, INC; THE
DRIFTERS, INC.; BOWEN AGENCY LTD/ADMIRAL
TALENT

On Appeal from the United States District Court
for the District of New Jersey

Dist. Ct. No. 95-cv-03794
District Court Judge: The Honorable Nicholas H. Politan

Argued: January 13, 2000

Before: ALITO and BARRY, Cir cuit Judges,
and ALDISERT, Senior Circuit Judge

(Opinion Filed: February 9, 2001)

Stephen B. Judlowe, Esq. (argued)
Lisa M. Ferri, Esq.
Eve Kunen, Esq.
Vincent A. Sireci, Esq.
Hopgood, Calimafde, Kalil &
 Judlowe, LLP
60 East 42nd Street
New York, New York 10165

Kenneth D. McPherson, Jr., Esq.
Mark J. Ingber, Esq.
Waters, McPherson, McNeill
300 Lighting Way
P.O. Box 1560, 7th Floor
Secaucus, New Jersey 07096
 Attorneys for Appellant

James P. Flynn, Esq. (argued)
Epstein Becker & Green, P.C.
Gateway Two
12th Floor
Newark, New Jersey 07102

Joshua Levine
Law Office of Ira Levine
0-99 Plaza Road
P.O. Box 2777
Fair Lawn, New Jersey 07410
 Attorneys for Appellees

OPINION OF THE COURT

ALITO, Circuit Judge:

This is an appeal from orders enter ed by the District Court after a trial concerning the right to use the mark "The Drifters" for a singing group. Larry Marshak, who acquired a federally registered service mark for "The Drifters" name in 1978, brought this action against Faye Treadwell and others, claiming that they were infringing his mark. The defendants contended that Marshak's federally registered mark had been procur ed by fraud and that Marshak was infringing senior common-law rights. After a

2

trial and post-trial motions, the District Court ordered that Marshak's federally registered mark be canceled, permanently enjoined Marshak from using the mark in commerce, and required an accounting of all profits received by Marshak since he began using the mark. Marshak then took this appeal. We affirm in part and dismiss in part for lack of appellate jurisdiction.

I.

The Drifters were one of the classic popular singing groups of the 1950s and early 1960s. Among their well-known hits were "Under the Boardwalk," "On Broadway," and "Save the Last Dance for Me."

The Drifters first appeared in 1953 and came under the management of George Treadwell the following year. From then until his death in 1967, George Treadwell managed the group through The Drifters, Inc., a New York corporation that he formed. George Treadwell hired and paid salaries to the members of the group, who changed continually over the years. He also scheduled the group's performances, negotiated their recording contracts, and chose their music and arrangements.

In 1959, George Treadwell released all of the then-current members of the group and signed the former members of a group called the Five Crowns to perform as The Drifters. The new members included Charlie Thomas, Elsbeary Hobbs, and Dock Green. Like all other members of the Drifters, Thomas, Hobbs, and Green signed contracts that provided in pertinent part as follows:

> The Artist agrees that the name THE DRIFTERS belongs exclusively to the employer and that he will not at any time use the name of The Drifters or any name similar thereto or any name incorporating The Drifters. In the event the employee leaves the employ of The Drifters he will not in any way advertise or attempt to publicize the fact that he had been a member of a singing group known as The Drifters and will not associate his name in any manner with The Drifters; and he further acknowledges that the name, The Drifters, is a valuable property and any violation of this

3

paragraph could not be adequately compensated by money damages and he therefore agr ees that the employer shall be entitled to an injunction in any Court of competent jurisdiction to enjoin any violation or threatened violation of the contract by the Artist.

App. at 1264.

When George Treadwell died, his wife, Faye Treadwell, whom he married in 1955, became the sole shar eholder of The Drifters, Inc., and she took over the management of the group. She later formed Treadwell's Drifters, Inc., a New Jersey corporation, and all of the assets and contractual rights of The Drifters, Inc. were transferr ed to the new corporation.

By the time of George Treadwell's death, Hobbs and Green had already left the group. Charlie Thomas left shortly thereafter, but other members continued to perform under Treadwell's direction. By the late 1960s, however, the popularity of "The Drifters" and similar gr oups had waned in this country, and Treadwell focused her efforts on Europe, where the group remained popular. After 1970, the Drifters made few live appearances in this country, but the group's classic recordings continued to be played on the radio, and Atlantic Records continued to pay r oyalties to The Drifters, Inc. or Treadwell's Drifters, Inc. See App. at 720.

Larry Marshak's involvement with The Drifters began in 1969. CBS radio had recently changed fr om a contemporary to an "oldies" format. T o generate enthusiasm for its format change, CBS appr oached Rock Magazine and proposed a partnership to r eunite old singing groups to perform live concerts. Marshak, who was an editor at Rock Magazine, was given the task of reuniting some of these groups for the first revival concert at the New York Academy of Music. Among the groups that Marshak attempted to reunite was "The Drifters." Marshak contacted several former members of the group, including Thomas, Hobbs, and Green, all of whom agreed to perform for Marshak. The revival concerts were a success, and the reunited members agreed to continue per forming under "The Drifters" name. In 1972, Thomas, Hobbs, and Green signed an exclusive management contract with Marshak.

4

Soon after the revival group began per forming, Marshak received a letter from Treadwell's attorney asserting that Marshak was infringing her right to use the gr oup's name. App. at 244. The letter pointed out that the for mer members of the group had signed contracts with The Drifters, Inc. in which they had given up any right to use the group name. Id. Despite this war ning, Marshak persisted in his efforts to promote and market his group.

In 1971, Treadwell brought an action against Marshak in state court in New York. Treadwell's request for a preliminary injunction to prevent Marshak and his group from using "The Drifters" name was denied, and the suit was eventually dismissed in 1973 because Tr eadwell "willfully defaulted and failed to answer interr ogatories propounded by defendants." App. at 1245. At the trial in the current case, Treadwell testified that she and her group stopped performing in the United States in part because she did not have the financial resour ces to defend her mark against Marshak through extended litigation. See App. at 598.

Marshak, in contrast, benefitted from a r enewed interest in "The Drifters" in the United States that had resulted from a wave of nostalgia for the early days of rock and roll. Throughout the 1970s, Marshak's group made recordings, appeared on television, and gave live per formances.

Marshak began to litigate against other groups that used the name "The Drifters" or a variant. In 1976, Marshak learned that "The Platters," another r evived 1950s singing group, had been successful in preventing others from using their name by registering their service mark, and Marshak urged Thomas, Hobbs, and Green to do the same. Marshak convinced the trio that if they agreed to assign their rights to the name to him, he would continue as their manager and prevent others groups from using"The Drifters" name. In December 1976, Thomas, Hobbs, and Green, acting as a partnership, filed an application with the United States Patent & Trademark Office (PTO) to r egister "The Drifters" as a service mark for a singing group, and they assigned their rights to Marshak. See App. at 1267. In their registration application, Thomas, Hobbs, and Gr een each attested that

5

no other person, firm, corporation, or association, to the best of his knowledge and belief, has the right to use such mark in commerce either in the identical form thereof or in such near resemblance thereto as to be likely, when applied to the goods of such other person, to cause confusion, or to cause mistake, or deceive.

See 15 U.S.C. S 1051 (1976).

Marshak filed the present action in 1995, following the publication of Faye Treadwell's book, Save the Last Dance for Me, in which Treadwell claimed to be the sole owner of the Drifters mark. See App. at 875. Named as defendants were Faye Treadwell, The Drifters, Inc., Treadwell's Drifters, Inc., and a booking company. Marshak alleged that the defendants had infringed his mark and had thr eatened to continue to do so by offering Tr eadwell's book for sale and by engaging a group to perform as The Drifters. He asserted a claim under Section 32 of the Lanham Act, 15 U.S.C. S 1114(a), for infringement of his federally r egistered mark, as well as a claim under Section 43(a), 15 U.S.C.S 1125(a), and under the statutes of New York for violation of his common-law rights. He sought declaratory and injunctive relief and treble and punitive damages.

In their answer, the defendants claimed that Treadwell's Drifters had a superior common-law right to the mark, and they asserted as an affirmative defense that Marshak's federal registration had been procur ed by fraud. As a counterclaim, Treadwell's Drifters r epeated the allegation of fraudulent procurement. In addition, alleging that Marshak had infringed and continued to infringe its common-law right to the mark, Treadwell's Drifters asserted a claim under Section 43(a) of the Lanham Act and a state-law claim for unfair competition. The counterclaim sought, among other things, cancellation of Marshak's mark, declaratory and injunctive relief, and an accounting of Marshak's profits.

The case was tried before a jury, which found that Marshak or his assignors had perpetrated a fraud on the PTO in 1976. See App. at 1562. In accor dance with this finding, the District Court ordered the PTO to cancel

Marshak's federal registration. The jury also found, however, that Treadwell and her corporation had abandoned their common-law right to "The Drifters" mark by 1976. Moreover, the jury found that Marshak had established protectable common-law rights in the name by that time.

On cross post-trial motions, the District Court upheld the jury's verdict regarding Marshak's fraud on the PTO, but the Court vacated the jury verdict insofar as it found that Treadwell had abandoned her rights in 1976. Instead, the Court held that the continuous stream of r oyalty revenues collected by Treadwell since the 1960s was sufficient to defeat Marshak's claim of abandonment. See Marshak v. Treadwell, 58 F. Supp. 2d 551 (D.N.J. 1999). After additional briefing regarding appr opriate remedies, the Court molded the judgment to reflect that Marshak had infringed Treadwell's Drifters' common law rights. The Court then permanently enjoined Marshak fr om further use of the "The Drifters" mark in commerce and ordered an accounting of Marshak's profits for the entir e period of his infringement -- viz., from 1970 to 1998. Marshak appealed.

II.

We begin by examining our jurisdiction to r eview the various orders challenged on appeal. Under 28 U.S.C. S 1292(a)(1), we plainly have jurisdiction to review the permanent injunction prohibiting Marshak from using The Drifters mark. Under Santana Products, Inc. v. Compression Polymers, Inc., 8 F.3d 152 (3d Cir . 1993), the order requiring cancellation of Marshak's federally r egistered mark, standing alone, is not appealable under S 1292(a)(1), but Santana Products did not r each the question whether an order of cancellation may be reviewed pursuant to S 1292(a)(1) when a district court also issues an injunction against the use of the mark, as occurred her e. 8 F.3d at 155 & n.3.

When we have jurisdiction to review an or der relating to an injunction under S 1292(a)(1), our jurisdiction extends to matters inextricably linked to the appealable or der. See S.E.C. v. Black, 163 F.3d 188, 194 (3d Cir. 1998). In this

case, the ground on which cancellation of the federally registered mark was ordered-- fraud on the PTO -- was also asserted by Treadwell as a defense to Marshak's claim that she was infringing his incontestable mark. All of the arguments raised by Marshak on appeal in connection with the cancellation order apply as well to that defense. Under these circumstances, the link between the or der of cancellation and the injunctive order is close enough to permit review of the order of cancellation at this time. See Wrist-Rocket Mfg. Co. v. Saunders Archery Co., 516 F.2d 846, 849 (8th Cir. 1975) (court has jurisdiction under 28 U.S.C. S 1292(a)(1), to examine the merits of order granting a permanent injunction and ordering the cancellation of registration).

By contrast, we lack jurisdiction to review the portion of the District Court order requiring an accounting of Marshak's profits. Marshak contends that we have jurisdiction under the final order rule of 28 U.S.C. S 1291, but we do not agree. A final order is one that "leaves nothing for the court to do but execute the judgment." Catlin v. United States, 324 U.S. 229, 233 (1945). A finding of liability that does not also specify damages is not a final decision. See, e.g., Liberty Mut. Ins. Co. v. Wetzel, 424 U.S. 737, 744 (1976); Sun Shipbldg. & Dry Dock Co. v. Benefits Rev. Bd., 535 F.2d 758, 760 (3d Cir . 1976). Although the practical finality rule, also known as the For gay-Conrad doctrine, permits appellate review of an order that is not technically final but resolves all issues that are not purely ministerial, see Forgay v. Conrad, 47 U.S. (6 How.) 201, 204-05 (1848); Cromaglass Corp. v. Fer m, 500 F.2d 601, 605 (3d Cir. 1974) (en banc), the accounting at issue in this case does not come within that rule.

Our decision in Apex Fountain Sales, Inc. v. Kleinfeld, 27 F.3d 931 (3d Cir. 1994), a trademark infringement case, is apposite. In Apex Fountain Sales, the District Court entered a contempt order that, among other things, or dered an accounting of the net profits realized from sale of the infringing items. We held that the or der was not reviewable under the Forgay Conrad doctrine because the determination of net profits would not be easily reached. See id. at 936.

In Goodman v. Lee, 988 F.2d 619 (5th Cir. 1993), the Fifth Circuit addressed circumstances similar to those with which we are confronted. In that case, Shirley Goodman sued the heirs of her former recor ding partner, Audrey Lee, for copyright ownership rights to their 1956 hit song, "Let the Good Times Roll." The jury found in favor of Goodman, and the District Court ordered the r egistrar of copyrights to correct the records of the copyright office to reflect Goodman's ownership. Furthermore, the Court ordered Lee's heirs to account to Goodman for one-half of all royalties paid over the 29-year period between the time of the song's release and the date of the judgment. The District Court did not reduce the award to a certain sum.

On appeal, the Fifth Circuit acknowledged a line of cases in which appeal had been permitted prior to a final accounting because the accounting was viewed as "purely `ministerial' and/or `mechanical.' " Id. at 626 (citing Winston Network v. Indiana Harbor Belt R. Co., 944 F .2d 1351 (7th Cir. 1991); Parks v. Pavkovic, 753 F .2d 1397 (7th Cir. 1985)). However, the Goodman Court concluded that the accounting in the case before it would not be purely ministerial:

> The award contemplates identifying royalties paid on one particular song to songwriter now dead and thereafter to his heirs over an almost thirty (30) year period. . . . Clearly, the amount to be divided is not known, was not identified in the extensive district court experience and must be reconstructed r equiring factual determinations by the district court.

Id. at 627. Therefore, the Court held that the judgment was not within the Forgay-Conrad rule and was not an appealable final order. Id.

A similar result was reached in Zwack v. Kraus Bros & Co., 237 F.2d 255 (2d Cir. 1956). There, a Hungarian firm sought injunctive relief against its United States distributor to enforce its trademark, as well as damages and an accounting of profits. The District Court held the distributor liable but referred the matter to a special master for an accounting of profits. The Second Cir cuit held that the reference to the special master to determine damages rendered the entire order interlocutory. See id. at 261.

9

In this case, as in the cases noted above, the accounting cannot reasonably be characterized as mer ely ministerial. The District Court ordered Marshak "to account to Treadwell for the profits he ear ned in each year, beginning with the first act of infringement in 1970 and ending with the first day of trial testimony in this case." App. at 87. As in Apex Fountain Sales, the parties her e have a long history of contentious litigation, and there is a substantial likelihood that "one or both parties will dispute the ultimate amount of damages awarded, leading to a second appeal. This would be contrary to the federal judiciary's general policy against piecemeal litigation." Apex Fountain Sales, 27 F.3d at 935.

We are aware that the District Court, in denying Treadwell's request that a special master be appointed, expressed the opinion that "the accounting will not be complicated or exceptional," App. at 1687 n.2, but that statement was made in a notably differ ent context. An accounting may seem simple enough to persuade a District Court that the appointment of a special master is not necessary and still be far from ministerial in the sense relevant here. We must ther efore dismiss Marshak's appeal insofar as it contests the portion of the district court order requiring an accounting.1

III.

Turning to the merits of the issues over which we have jurisdiction, we first consider Marshak's ar guments relating to Treadwell's fraudulent procur ement defense and counterclaim.

_____

1. We are thus unable to expr ess our view as to whether any accounting should have been limited to the period of the appr opriate statute of limitations. If on remand the District Court goes forward with the accounting, consideration of the propriety of that remedy will have to await the completion of the accounting and the entry of a final order. We recognize that this procedure may r esult in a considerable waste of time and resources in connection with the accounting, but the scope of our appellate jurisdiction leaves no alternative.

A.

Marshak argues that the fraudulent procur ement defense and counterclaim are time-barred. Relying chiefly on our decision in Beauty Time, Inc. v. VU Skin Sys., Inc., 118 F.3d 140, 143 (3d Cir. 1997), Marshak maintains that the Lanham Act does not specify the time within which a claim of fraudulent procurement may be asserted, that it is therefore appropriate to borr ow the most analogous state statute of limitations, and that under the most analogous state statute -- either the New York or the New Jersey six-year statute of limitations for actions sounding in fraud -- Treadwell's claim is barred. W e reject this argument based on the plain language of the Lanham Act.

Treadwell's counterclaim was br ought under Section 14 of the Lanham Act, 15 U.S.C. S 1064, which specifies in detail the time limits for petitioning to cancel a mark on various grounds. This provision states in relevant part:

> A petition to cancel a registration of a mark, stating the grounds relied upon, may, upon payment of the prescribed fee, be filed as follows by any person who believes that he is or will be damaged . . . by the registration of a mark on the principal r egister established by this chapter . . .
>
>     * * *
>
> (1) Within five years from the date of the registration of the mark under this chapter.
>
> (2) Within five years from the date of publication under section 1062(c) of this title of a mark registered under the Act of March 3, 1881, or the Act of February 20, 1905.
>
> (3) At any time if the register ed mark becomes the generic name for the goods or services, or a portion thereof, for which it is registered, or has been abandoned, or its registration was obtained fraudulently or contrary to the provisions of section 1054 of this title or of subsection (a), (b), or (c) of section 1052 of this title for a registration under this chapter.

11

Lanham Act S 14, 15 U.S.C. S 1064 (emphasis added).

The first step in interpreting a statute is to determine "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997). See also, e.g., Michael C. v. Radnor Township Sch. Dist., 202 F.3d 642, 648–49 (3d Cir. 2000); Deane v. Pocono Med. Ctr., 142 F .3d 138, 146 (3d Cir. 1998) (en banc). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson, 519 U.S. at 341. Where we find that the statutory language has a clear meaning, we need not look further. Id. at 340.

Here, the meaning of the phrase "at any time" in Section 14 (3) is clear even if that particular subsection is viewed in isolation. Moreover, the contrast between the five–year time limits imposed in subsections (1) and (2) and the use of the phrase "at any time" in subsection (3) r einforces the point that the language of subsection (3) means what it says: a petition falling within subsection (3), including a petition seeking cancellation based on fraud, is not subject to any time limit but may be filed "at any time." W e note that the Supreme Court has recognized that the pr edecessor of the current Section 14(3) "allows cancellation of an incontestable mark at any time . . . if it was obtained fraudulently." Park `n Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 195 (1985) (emphasis added).2

We recognize that Section 14(3) itself applies to a petition filed with the Patent and Trademark Office, rather than a claim asserted in court, but Section 37 of the Lanham Act, 15 U.S.C. S 1119,3 gives federal courts concurrent authority

_____

2. We also note that the PTO has consistently held that the phrase "at any time" precludes a laches defense to a cancellation action premised on fraudulent procurement. See Harjo v. Pro Football, Inc., 30 U.S.P.Q.2d 1828, 1831 (T.T.A.B. 1994); TBC Corp. v. Grand Prix Ltd., 12 U.S.P.Q.2d 1311, 1313 (T.T.A.B. 1989); Bausch & Lomb, Inc. v. Leupold & Stevens, Inc., 1 U.S.P.Q.2d 1497, 1499–1500 (T .T.A.B. 1986).

3. Section 37 provides:

12

to cancel registered marks when the validity of the mark is called into question in a judicial proceeding. See Ditri v. Coldwell Banker Residential Affiliates, Inc., 954 F.2d 869, 873 (3d Cir. 1992); Simmonds Aerocessories, Ltd. v. Elastic Stop Nut Corp., 257 F.2d 485, 491 (3d Cir . 1958). As we explained in Ditri, "[a]lthough a petition to the Patent and Trademarks Office is the primary means of securing a cancellation, the district court has concurr ent power to order cancellation as well for the obvious r eason that an entire controversy may thus be expediently resolved in one forum." Id. at 873. We see no r eason why Congress would have wanted to allow a petition for cancellation under Section 14(3) to be filed with the PTO "at any time" but to subject an identical request, when entertained by a District Court pursuant to its concurrent power under Section 37, to a state statute of limitations. Such a regime would prevent a case like the one before us fr om being "expediently resolved in one forum." Id.

The language of the Lanham Act also makes it clear that there is no time limit on the assertion of fraudulent procurement as a defense to an infringement claim brought by the holder of a mark that has become incontestable. Under Section 15 of the Lanham Act, 15 U.S.C. S 1065, an otherwise incontestable mark may be attacked "on a ground for which application to cancel may befiled at any time under paragraphs (3) and (5) of section 1064 of this title." Accordingly, the language of the Lanham Act makes it clear that a claim for cancellation of a mark based on fraudulent procurement and a defense to an otherwise

_____

In any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, and otherwise rectify the register with r espect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Director, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby.

15 U.S.C. S 1119.

13

incontestable mark on a similar ground may be asserted at
any time.4

The reason for this rule is quite simple—the interest
vindicated by Section 14 is not just the injury to the
challenging party, but the integrity of the r egister. Where
the interest at issue is the integrity of the federal register,
a statute of limitations should not operate to frustrate that
interest. See Harjo v. Pro Football, Inc., 30 U.S.P.Q.2d 1828,
1831 (T.T.A.B. 1994) ("The Boar d has held that the
equitable defenses of laches and estoppel ar e not available
against claims of fraud and abandonment because ther e
exists a broader interest——a `public policy' interest——in
addition to a private interest in removing from the register
those registrations procured or maintained by fraud and
those registrations for marks that have been abandoned.");
TBC Corp. v. Grand Prix Ltd., 12 U.S.P.Q.2d 1311, 1313
(T.T.A.B. 1989) ("Where the pr oposed ground for
cancellation is abandonment, equitable defenses should be
unavailable for the same reason they have been held
unavailable when the ground asserted is descriptiveness or
fraud. It is in the public interest to r emove abandoned
registrations from the register . We therefore hold that the

_____

4. The origins of the "at any time" language of Section 14(3) support this
conclusion. This language derives from Section 13 of the Trademark Act
of 1905, 15 U.S.C. S 93. That section pr ovided that "whenever any
person shall deem himself injured by the r egistration of a trade-mark in
the Patent Office he may at any time apply to the Commissioner of
Patents to cancel the registration." (emphasis added). The accepted
meaning of the phrase "at any time" under the 1905 Act was that it
excluded the defense of laches in a cancellation pr oceeding. See Dwinell—
Wright Co. v. National Fruit Prod. Co., 129 F.2d 848, 853 (1st Cir. 1942);
White House Milk Prods. Co. v. Dwinell—W right Co., 111 F.2d 490, 493
(C.C.P.A. 1940); Cluett, Peabody & Co. v. Hartogensis, 41 F.2d 94, 97
(C.C.P.A. 1930). The language in the 1905 Act, in turn, was derived from
a line of Supreme Court precedent holding that laches would not bar an
injunction against future infringement, but only an accounting for past
profits. See Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19 (1900);
Menendez v. Holt, 128 U.S. 514 (1888); McLean v. Fleming, 96 U.S. (6
Otto.) 245 (1877). It is telling that although the Lanham Act now
specifically provides that an infringement action is subject to equitable
defenses, see 15 U.S.C. S 1125, the statute continues to provide that a
mark is vulnerable to a cancellation proceeding"at any time."

14

prior registration defense is unavailable in a proceeding where the issue is abandonment."). Accordingly, we hold that Treadwell's fraudulent procurement defense and counterclaim were not time-barred.

Marshak's only attempt to address the language of the Lanham Act permitting fraudulent procurement to be asserted in these contexts "at any time" appears in his reply brief, where he argues that this language merely reflects the fact that the grounds for cancellation covered by Section 14(3), such as a mark's becoming generic,"are of a type in which the right to bring cancellation may arise `at any time', i.e., some years (very possibly more that the five years of Section 1064(1)) after trademark registration." Reply Br. at 4 (emphasis in original). Marshak suggests that once a plaintiff has become aware of the necessary predicate for bringing a cancellation proceeding, the plaintiff should be required to do so within the limitations period specified by the most analogous state statute.

Marshak's argument cannot be reconciled with the plain language of Section 14(3), which, as noted, provides unambiguously that a petition seeking cancellation based on fraudulent procurement "may . . . befiled" "at any time." Marshak would read Section 14(3) as essentially a tolling provision, but the drafters of this provision would surely have selected different language if that is what they had intended. For all these reasons, we hold that Treadwell's counterclaim and defense are not time-barred.

This holding is entirely consistent with our decision in Beauty Time, on which Marshak relies. In Beauty Time, count XI of the complaint asserted a claim under Section 38 of the Lanham Act, 15 U.S.C. S 1120, which provides as follows:

> Any person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof.

A claim for damages brought under Section 38 is not governed by any of the time limits set out in Section 14(3)

15

or any other provision of the Act specifying a limitations period, and therefore we held that the plaintiff 's Section 38 claim for fraud was subject to Pennsylvania's two-year statute of limitations for actions based on fraud. 118 F.3d at 143-49. We did not mention Section 14(3) or suggest that a request for cancellation pursuant to that section is subject to a state statute of limitations. Thus, Beauty Time does not support Marshak's argument her e.5

B.

Marshak argues that Treadwell's fraudulent procurement defense and counterclaim were barr ed by principles of collateral estoppel. In the District Court, Marshak relied on several prior adjudications, but on appeal he focuses on Marshak v. Sheppard, 666 F.Supp. 590 (S.D.N.Y. 1987), a Lanham Act action brought by Marshak against, among

_____

5. Marshak also relies (see Appellant's Br . at 33, Reply Br. at 2) on the statement in 5 J. Thomas McCarthy, McCarthy on T rademarks and Unfair Competition S 31:59, at 31-108 (4th ed. 2000), that "[w]hen fraud is used as a basis for challenging the validity of an incontestable registration, the claim must be asserted within the relevant statute of limitations." On its face, this statement supports Marshak's argument, but we decline to follow it in the particular context here, i.e., where Section 14(3) applies. The treatise does not attempt to explain how this sweeping statement can be reconciled with the language of Section 14(3), and elsewhere the treatise recognizes that a request to cancel based on fraud may be filed at any time. 5 McCarthy, supra, S 31:80. Furthermore, the authority cited by the treatise in support of this statement, Calzaturificio Rangoni S.p.A. v. United States Shoe Corp., 868 F.Supp. 1414 (S.D.N.Y 1994), is unconvincing. Borrowing a state statute of limitations, the District Court in that case r elied solely on a prior District Court decision that had applied a state statute to a false advertising claim brought under Section 43(a) of the Lanham Act. See 868 F.Supp. at 1420 (relying on PepsiCo., Inc. v. Dunlop Tire & Rubber Corp., 578 F.Supp. 196, 198 (S.D.N.Y . 1984)). A false advertising claim under Section 43(a), however, is quite dif ferent from a request for cancellation under Section 14(3). Assuming that it is appropriate to apply a state statute to such a Section 43(a) claim, it does not follow that all other Lanham Act claims or defenses relating to fraud must be treated similarly even if the language of the Act expressly addresses the question of the time within which those claims or defense may be asserted.

others, a performer who appeared with a group called "Rick Sheppard and the Drifters."6 In that case, Sheppard unsuccessfully sought cancellation of Marshak's r egistered mark on grounds very similar to those asserted by Treadwell in this case, and Marshak contends that Treadwell is bound by the judgment in that case. Marshak acknowledges that Treadwell was not a party in Marshak v. Sheppard, but he maintains that she is bound on the ground that she wielded a "laboring oar" on behalf of the defendants. Appellant's Br. at 49.

The principle on which Marshak relies is aptly stated as follows in the Restatement (Second) of Judgments S 39:

> A person who is not a party to an action but who controls or substantially participates in the control of the presentation on behalf of a party is bound by the determination of issues decided as though he were a party.

Comment c. adds:

> To have control of litigation requir es that a person have effective choice as to the legal theories and proofs to be advanced in behalf of the party to the action. He must also have control over the opportunity to obtain review.

Cf. Collins v. E.I. DuPont de Nemours & Co., 34 F.3d 172, 176 (3d Cir. 1994) (New Jersey law).

Here, Marshak has not pointed to any dir ect evidence that Treadwell exercised any contr ol over the prior litigation. Indeed, his brief notes only two concr ete facts that are relevant: Treadwell testified in the prior case and had an interest in the outcome (in the sense that she would have benefitted if Marshak's federally registered mark had

---

6. The section of Marshak's brief concerning collateral estoppel (Appellant's Br. at 48-49) does not r efer to the dismissal of Treadwell's 1971 action in New York state court. As noted, that case was dismissed because Treadwell did not comply with discovery. The District Court held that, under New York law, such a dismissal was without prejudice. See Marshak, 58 F. Supp. 2d at 562 n.17 (citing Maitland v. Trojan Elec. & Mach. Co., 480 N.E.2d 736, 737 (N.Y. 1985)). Because Marshak does not rely on this dismissal as a basis for his collateral estoppel argument, we need not consider that issue here.

been ordered canceled). Appellant's Br . at 49. Without more, these facts are plainly insufficient to permit a reasonable inference that she exer cised any control over litigation decisions or strategy. Marshak's collateral estoppel argument must therefore be rejected.

C.

Marshak contends that the jury's finding of fraud was based on an erroneous jury instruction, which stated that fraud on the PTO could be shown by proof that the applicants "should have known" about T readwell's superior right to "The Drifters" name. Although we agr ee with Marshak that this instruction was erroneous, we are convinced that the error was harmless.

Most of the District Court's lengthy instruction on fraudulent intent is unobjectionable,7  but at several points, the Court told the jury that "[t]he defense of fraud will turn upon whether you believe that the persons who r egistered the mark knew or reasonably should have known that someone else had legal rights to the name `The Drifters.' " App. at 1482-83 (emphasis added). Marshak objects that the "should have known" language misstates the nature of the PTO oath and the requisite measure of proof.

At the time when Thomas, Hobbs, and Green submitted their declaration, an applicant was requir ed to state that

> no other person, firm, corporation, or association, to the best of his knowledge and belief, has the right to use such mark in commerce either in the identical form thereof or in such near resemblance thereto as to be likely, when applied to the goods of such other person, to cause confusion, or to cause mistake, or deceive.

15 U.S.C. S 1051 (1976) (emphasis added). Thus, applicants attested only to their own subjective knowledge and belief.

To demonstrate that a federal registration was fraudulently procured, therefor e, a challenging party must

_____

7. Much of the charge is set forth in the District Court's opinion. See Marshak, 58 F. Supp. 2d at 566-67.

18

adduce evidence that the registrant actually knew or believed that someone else had a right to the mark. See Metro Traffic Control, Inc. v. Shadow Network Inc., 104 F.3d 336, 340 (Fed. Cir. 1997); see also 5 McCarthy supra, S 31:76. Accordingly the instruction given by the District Court was not entirely correct.8

The error, however, was har mless because " `it is highly probable that [it] did not affect the outcome of the case.' " West v. Philadelphia Elec. Co., 45 F .3d 744, 752 (3d Cir. 1995). The "should have known" language used by the District Court could have affected the ver dict only if a properly instructed jury would have found that the applicants had an actual but unreasonable belief that no one else had a right to use "The Drifters" name. However, based on the evidence in this case, we are convinced that a properly instructed jury would not have made such a finding. Marshak has not called to our attention any appreciable evidence that the applicants had a sincere belief that no one else had a right to the mark, and there was very strong evidence to the contrary. Marshak's cross-

_____

8. In support of its instruction, the District Court relied on G.H. Mumm & CIE v. Desnoes & Geddes, Ltd., 917 F.2d 1292, 1296 (Fed. Cir. 1990), and Torres v. Cantine Torresella S.r.l., 808 F.2d 46, 49 (Fed. Cir. 1986). In both of those cases, the Court stated that an applicant knowingly attempts to mislead the PTO if the applicant files a renewal application stating that its mark is currently in use in interstate commerce but the applicant "knows or should know" that this is not true. Neither case involved a jury instruction, and we do not interpr et those cases as taking
the position that proof of subjective bad faith is unnecessary in order to prove fraud on the PTO. On the contrary, T orres emphasizes that an applicant must act "knowingly" in order to commit such a fraud. 808 F.2d at 48. We understand these opinions to mean simply that in the particular context presented there -- where the representation related to a matter about which the applicant almost certainly had subjective knowledge, i.e., whether the applicant's own company was using the mark in commerce -- proof that the applicant should have known was ample to prove actual knowledge. We note that the Federal Circuit has subsequently held that proof of actual knowledge or belief is necessary in the context of fraudulent procurement.See Metro Traffic Control, 104 F.3d at 340. We also note that even T readwell's brief seems to give G.H. Mumm and Torres a similarlynarrow interpretation. See Appellee's Br. at 48-49 & n. 12.

19

examination, in which excerpts of Thomas' deposition were read, essentially produced the admission that George Treadwell had been "the true owner of the Drifters' name," that George Treadwell "had rights to the name," and that Thomas had simply been "an employee." App. 470. Similarly, when Marshak was asked whether a member of "The Drifters" during the George T readwell era "would . . . have had the right to use the name Drifters," Marshak responded that "[t]he only person who has the right to the name is the person that develops it and keeps it in the public's eye." App. 510. Marshak also testified that a member of "The Drifters" was simply an "employee" and that an employee of a group that provides entertainment cannot "go around saying he is [the gr oup]." See App. 1662. In view of the evidence, we are convinced that the mistake in the jury instruction was harmless.

D.

Marshak's final argument concerning fraudulent procurement is that there was insufficient evidence to support the jury's finding. The jury's ver dict must be sustained if it is rationally supported, see Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1098 (3d Cir. 1995), and the verdict here has ample support. In addition to the direct evidence just mentioned r egarding the applicants' and Marshak's subjective knowledge and belief, there was substantial circumstantial evidence from which such knowledge or belief could be inferred. As noted, the applicants had signed contracts acknowledging that the name "The Drifters" belonged exclusively to their employer and that they had no right to that name. Under those contracts, if they left the group, they could not even publicize the fact that they had been members.

In arguing that the evidence was insufficient, Marshak relies on the 1971 ruling of the New York state court denying Treadwell's request for a pr eliminary injunction and opining that Treadwell had not established that Marshak or the members of his group "ha[d] been infringing upon [her] good name and good will." App. 724. This was certainly evidence for the jury to consider, but it is

20

insufficient to overturn the jury's ver dict.9 We thus hold that fraud in the procurement of the federal mark was properly proven and that cancellation was justified.

IV.

We now consider Marshak's arguments r elating to Treadwell's claim that Marshak was infringing upon her superior common-law right. As previously noted, the counterclaim of Treadwell's Drifters asserted a claim under Section 43(a) of the Lanham Act, 15 U.S.C. S 1125(a), based on Marshak's alleged infringement of their common law right to "The Drifters" mark. In order to prove this claim, the counterclaimant was required to show that "(1) the mark [was] valid and legally protectable; (2) the mark [was] owned by the plaintiff; and (3) [Marshak's] use of the mark to identify goods or services [was] likely to create confusion concerning the origin of the goods or services." Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 472 (3d Cir. 1994). The jury did not find that the counterclaimant had established these elements. On the contrary, the jury found that Treadwell and her companies had abandoned their common law rights and that Marshak had not used "The Drifters" name in such a way as to misr epresent the source of his goods or services or to falsely suggest a connection between those services and Tr eadwell's Drifters. App. at 1562. The District Court, however, explicitly granted judgment as a matter of law in favor of the counterclaimant on the issue of abandonment and, in effect, did the same thing with respect to the entire Section

_____

9. The evidence regarding the 1971 state court ruling does not undermine our conclusion that the error in the jury instruction discussed in part III.C, supra, was har mless. The jury instruction error related to the question of subjective knowledge or belief, but the evidence
concerning the 1971 state court ruling is evidence of objective reasonableness, not the applicants' subjective state of mind. As the District Court noted, "Marshak has cited no testimony or other evidence that he or his assignors subjectively believed that the dismissal of Treadwell's 1971 lawsuit constituted afinal adjudication of their trademark rights," 58 F.Supp. 2d at 562, and thus established that Treadwell had no right to the use of"The Drifters" name.

21

43(a) counterclaim. On appeal, Marshak challenges this disposition on several grounds.

A.

Marshak contends that the District Court err ed in entering judgment as a matter of law against him on the issue of abandonment.[10] W e do not agree.

Section 45 of the Lanham Act, 15 U.S.C. S 1127, provides that "[a] mark shall be deemed abandoned . . . [w]hen its use has been discontinued with intent not to r esume use." "To establish the defense of abandonment it is necessary to show not only acts indicating a practical abandonment, but an actual intent to abandon." Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 31 (1900). "Intent not to resume may be inferred from cir cumstances," 15 U.S.C. S 1127, but "abandonment, being in the nature of a forfeiture, must be strictly proved." United States Jaycees v. Philadelphia Jaycees, 639 F.2d 134, 139 (3d Cir. 1981).

Thus, in order to show that there was an abandonment of the common law rights originally acquired by George Treadwell and The Drifters, Inc., Marshak bore the burden

_____

10. Even if the jury had sustained Marshak's federal registration, it would still be necessary to consider the question of abandonment. Even if a junior user's mark has attained incontestable status, such status does not cut off the rights of a senior user . See Natural Footware Ltd. v. Hart, Schnaffner & Marx, 760 F.2d 1383, 1395 (3d Cir. 1985) ("[A] federal registrant is still subject to the defense of a prior user of the mark who has established a market in specific areas notwithstanding that senior user's failure to register.");see also 815 Tonawanda Street Corp.v. Fay's Drug Co., 842 F.2d 643, 646 (2d Cir . 1988) ("[T]he plain meaning of the S 1065 exception is that if a party has acquir ed common-law trademark rights continuing since before the publication of the federal registration, then to that extent the registration will not be incontestable.") (citations omitted)); Cuban Cigar Brands N.V. v. Upmann Int'l, Inc., 457 F. Supp. 1090, 1100 (S.D.N.Y. 1978) ("[D]efendant's marks are not incontestable as against that of plaintiff for, since defendant's use infringes plaintiff 's valid common law rights obtained long prior to defendant's registration, it has no shield of incontestability in a suit by plaintiff to enforce that mark."). Since Marshak has used "The Drifters" continuously since 1970, his ability to enjoin Treadwell's use depends on whether she abandoned the mark.

of "strickly" proving (a) that use of The Drifters mark had been discontinued in the United States[11] and (b) that the owner of the common law rights had the actual intent to abandon the mark. Marshak could have established a prima facie case of abandonment, however, by proving non-use in this country for two consecutive years. Lanham Act S 45, 15 U.S.C. 1127 (1994).[12]

Here, the District Court found that ther e was no abandonment as a matter of law because "the original Drifters recordings have been played on the radio and sold in record stores, without interruption, for the past 40 years." Marshak, 58 F. Supp. 2d at 575. The District Court adopted the reasoning of The Kingsmen v. K-Tel Int'l, Ltd., 557 F. Supp. 178, 183 (S.D.N.Y. 1983), in which the court held that a mark designating a disbanded singing gr oup remained in use because the group's r ecordings were played and the group continued to collect r oyalties. The court wrote:

> We find that defendants have failed to show either non-use or intent to abandon. Even though plaintif fs disbanded their group in 1967 and ceased r ecording new material, there is no evidence suggesting that they failed to use the name Kingsmen during the period from 1967 to the present to promote their previously recorded albums. Moreover, the fact that these individuals continue to receive royalties for Kingsmen recordings flies in the face of any suggestion of intent to abandon use of the name Kingsmen. These plaintif fs have no more abandoned their right to pr otect the name of Kingsmen than have The Beatles, The Supremes or any other group that has disbanded and ceased performing and recor ding, but continues to collect royalties from the sale of pr eviously recorded material. We must reject defendants' contentions that

---

11. For purposes of trademark rights in the United States, "use" means use in the United States, not in other nations. See Rivard v. Linville, 133
F.3d 1446, 1448-49 (Fed. Cir. 1998).

12. In 1994, the statute was amended to pr ovide that three, not two, years of nonuse were needed to make out a prima facie case of abandonment.

23

the name Kingsmen has been abandoned to the public domain.

Id.

We concur with this reasoning, and we also agree with the District Court that it mandates the entry of judgment as a matter of law against Marshak. As the District Court put it, "[a] successful musical group does not abandon its mark unless there is proof that the owner ceased to commercially exploit the mark's secondary meaning in the music industry." Marshak, 58 F. Supp. 2d at 575; see also Robi v. Reed, 173 F.3d 736 (9th Cir . 1999); HEC Enters., Ltd. v. Deep Purple, Inc., 213 U.S.P.Q. 991 (C.D. Cal. 1980).

Marshak bore the burden of proving non-use and actual intent to abandon. United States Jaycees v. Philadelphia Jaycees, 639 F.2d at 139. Tr eadwell's Drifters were entitled to judgment as a matter of law on the issue of abandonment because, even giving Marshak the benefit of all reasonable inferences, Bar na v. City of Perth Amboy, 42 F.3d 809, 813 n.5 (3d Cir. 1994), the evidence was insufficient to establish those elements. Motter v. Everest & Jennings, Inc., 883 F.2d 1223, 1228-29 (3d Cir. 1989).

Marshak did not prove non-use, i.e., that the classic recordings of "The Drifters" wer e not played and that the resulting royalties were not paid. On the contrary, the parties stipulated that "The Drifters" r ecords and albums continue to be played and sold in the United States and that many of their songs have now been recor ded on compact disk and re-released. App. at 110. In addition, Treadwell testified that The Drifters, Inc. and Treadwell Drifters, Inc. have continuously received r oyalties from Atlantic Records for the sale of Drifters r ecords in the United States. App. at 720. Likewise, Marshak failed to prove an actual intent to abandon. The continuous use of the mark in connection with the commercial exploitation of the group's recordings in this country gave rise to a strong inference of an intent not to abandon the mark.

In arguing that judgment as a matter of law was improper, Marshak relies on the following evidence. First, Treadwell dropped her 1971 action against Marshak in New York state court after the court denied her application for a

24

preliminary injunction and issued an unfavorable opinion. Second, Treadwell did not oppose the federal registration of Marshak's mark or previously seek to have it canceled. Third, Treadwell failed to challenge numerous violations of "The Drifters" name, whereas Marshak stopped those uses through legal action. Fourth, Treadwell left for England in 1972. Fifth, Treadwell's English r ecording contracts did not provide for distribution in the United States. However, once it is recognized that the commercial exploitation of classic Drifters recordings in this country constitutes use, it is apparent that the evidence that Marshak cites is insufficient to show either the non-use and or the actual intent to abandon that are necessary for a finding of abandonment.

B.

Marshak argues that the District Court err ed in holding that he infringed the common-law rights held by Treadwell's Drifters. We conclude, however, that Treadwell's Drifters were entitled to judgment as a matter of law on their infringement claim.

As previously noted, Treadwell's Drifters were required to show (1) that their mark was valid and legally pr otectable; (2) that they owned the mark; and (3) that Marshak's use of the mark to identify his group was likely to create confusion concerning their origin. Fisons Horticulture, Inc., 30 F.3d at 472. In view of our holding r egarding abandonment, there can be no question r egarding elements one and two, and we do not understand Marshak to contest those elements on any other ground.

With regard to the third element, Marshak argues that the District Court should not have disturbed the jury's finding that Marshak had not used "The Drifters" name in such a way as to misrepresent the sour ce of his goods or services or to falsely suggest a connection between those services and Treadwell's Drifters. App. at 1562. We agree with the District Court, however, that a r easonable factfinder could not fail to find a likelihood of confusion on the facts of this case. As the District Court wr ote, "Marshak's group performs under the name `The Drifters'

25

and sings the same hit songs that were r ecorded and made famous by the original Drifters in the fifties and sixties. There is surely a likelihood of confusion because the public is misled to believe that Marshak's singers and the famous Drifters records originate from the same source." App. at 1681-82. Although infringement is generally a question for the jury, the evidence here mandated judgment for the counterclaimant and justified the entry of the permanent injunction barring Marshak from using the Drifters mark. We have considered all of Marshak's ar guments, and we find no basis for reversal of the portions of the District Court's orders that are properly before us.

V.

For these reasons, we affirm the or ders of the District Court insofar as they order cancellation of Marshak's federal registration and permanently enjoin Marshak from using The Drifters name in commerce. We dismiss the appeal insofar as it contests the order for an accounting of profits.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit