OPINION OF THE COURT
Diane A. Lebedeff, J.
In March of 2000, five teenagers who wished to embark upon a music career, with the support of their parents, sought and *623 secured judicial approval of several agreements regarding the group and a recording contract under the procedures applicable to contracts for child performers (Arts and Cultural Affairs Law § 35.03). Despite the apparent great success of the group, discord arose between the parents of three of the five youths and the group’s producer-manager.
Although both sides consent to end the future professional relationship between these three young men and the producer-manager, as stated on the record, each side asks to be permitted to retain rights to the group name and the right to perform together under that name, which are significant rights in the music and recording industry.
The essential facts are undisputed. The young men performed under the music group name of Dream Street and Dream Street became a hit. Their album “Dream Street” was listed on Billboard as the top independent album on July 28, 2001; their video was a most requested video on Nickelodeon’s Internet site, Nick.com. Appearances were sponsored or sponsorship offered by such prestigious corporations as McDonalds, Nabisco, Kraft and K-Mart. New recording opportunities were presented by Disney and Sony.
This success was not merely fortuitous. Dream Street is a “concept group” created by a manager-promoter who hires performers to play the roles in the group and directs its performance, much like Menudo, the Monkees and the Spice Girls. In this case, Dream Street Entertainment, Inc., was the organizer, promoter and manager, and was responsible for the group’s style and characteristics. As acknowledged in the contracts signed by these parents and the promoter which were approved by the court, Dream Street Entertainment, Inc. (Producer), “conceived of’ and “created” a group known as “Dream Street” and selected the five teenagers originally making up Dream Street; the agreement between the parents of these three teenagers and the Producer acknowledged that, even if any youth or youths were to depart from the group, the Producer “shall continue to own all right, title and interest in the name Dream Street, at all times, solely and exclusively, including all associated trademark and trade name interests” (exclusive services agreement art 1 [b], approved by order of Sept. 8, 2000, Weissberg, J.). It stands unrefuted that the Producer expended over $2 million to create, produce and promote the group, from the Producer’s first open call for prospective members of the group in November of 1998, through the selection and training of group members, and to date. The rights of *624 the Producer extend somewhat beyond the term of the recording contract (exclusive services agreement art 4 [a]).
This proceeding primarily concerns three group members, i.e., Frank John Galasso, Matthew Ballinger and Gregory Raposo. Christopher Pask, known as Christopher Trousdale, remains as the lead singer and does not desire to leave Dream Street. Jesse McCartney resigned from the group to pursue other highly attractive opportunities and is found to lack standing to join in this application.[1]
Given that there is no dispute that these three musicians are free to leave Dream Street, the first critical issue is that they and their parents, apparently with the support of their personal managers, request that they be able to continue to use the name Dream Street. The use of a group name by departing members cannot be authorized here. The clear concepts applicable to ownership of a common-law mark in a group name are detailed in Marshak v Treadwell (240 F3d 184 [3d Cir 2001]), which concerned “The Drifters,” a singing group particularly well known for their 1950s and early 1960s hit songs “Under the Boardwalk,” “On Broadway,” and “Save the Last Dance for Me.” Although not a concept group, The Drifters’ composition changed over the course of time, giving rise to a dispute as to who had rights to the group name. The court held that, to demonstrate ownership of a common-law mark in a group name, a claimant must show “(1) that [the] mark was valid and legally protectable; (2) that they owned the mark; and (3) that [another’s] use of the mark to identify his group was likely to create confusion concerning their origin” (240 F3d at 200; see also 240 F3d at 198). Once created, the right to the mark continues until the mark is clearly abandoned (id. at 199; accord Kingsmen v K-Tel Intl., 557 F Supp 178, 183 [SD NY 1983]). This statement of the law is consistent with governing copyright, trademark and Lanham Act concepts (see, Traphagen and Litowitz, The Song Remains The Same—But Not Necessarily The Name, 39 Am U L Rev 975 [1990]; Singer, A Rose by Any Other Name: Trademark Protection of the Names *625 of Popular Music Groups, 14 Hastings Comm & Ent LJ 331 [1992]).[2]
Under this standard, the Producer has a clear common-law right to the Dream Street name, and the use of that name by another would constitute infringement. Indeed, the performers and their parents originally acknowledged that Dream Street is a trademarked name and they have no rights to such name even under a partnership or joint venture theory (production agreement art 20 [a]). Explicit recognition of ownership of a group name by the promoters of a concept group is legally appropriate where, as here, it is undisputed that (1) the public associates with the group characteristics or a style which (2) is or are controlled by the promoter (Bell v Streetwise Records, 640 F Supp 575, 581 [D Mass 1986] [group New Edition was not a concept group, band members controlled distinctive personality and performing style of the individual members and owned group name]).
The second issue is the professed desire of the departing members to continue to perform together, which was advanced without the presentation of details of the planned operation of a new group. The failure to address the name to be used by such a group is reason to forestall judicial action, for many possible group names could trample on the Producer’s rights addressed above. Even former group members must be prohibited from using a variation of a group’s original name (see, collecting cases, McPherson, What’s in a Name? The Use, Misuse, and Trademark Protection of Band Names, 18 Ent & Sports Law 3 [Spring 2000]; see also, 2 McCarthy, Trademarks and Unfair Competition § 16:45 [dissolution and change of performing groups] [4th ed]).
Further, without placing concrete details before the court, the request merely seeks an advisory opinion. The court has insufficient basis to frame and issue a binding determination which would block the Producer from the future assertion of a claim of improper conduct or wrongful interference (see, as to limits on artist conduct in new group, Cesare v Work, 36 Ohio App 3d 26, 520 NE2d 586 [1987] [where manager found to hold *626 name and marks of the group, court enjoined former group members from use of name and distinctive style or “trade dress”]; see, as to interference claims, Partlett, From Victorian Opera to Rock and Rap: Inducement to Breach of Contract In the Music Industry, 66 Tul L Rev 771 [1992]). The lack of a proposal also leaves the Producer at a disadvantage, for it wishes to retain any contractual exclusivity rights it may have and is willing to make concessions, but cannot frame any particularized response because of the unstructured nature of the applicant’s request.
Finally, given that the artists are still minors, the court cannot approve an informal and unstructured concept without presentation and close review of an actual contract regarding a child performer in compliance with the Arts and Cultural Affairs Law. The very purpose of this type of proceeding is to secure judicial approval of a contract “to provide a degree of certainty for parties contracting with infants in the entertainment industry so that the validity of such contracts would not be rendered doubtful or subject to subsequent litigation concerning reasonableness” and “to completely eliminate the power to disaffirm under certain circumstances” (Matter of Prinze [Jonas], 38 NY2d 570, 575 [1976]; see, Munro, Under Age, Under Contract, and Under Protected: an Overview of the Administration and Regulation of Contracts with Minors in the Entertainment Industry in New York and California, 20 Colum-VLA JL & Arts 553 [1996]). A further goal of this type of “elaborate court proceedings” is a determination of what part of the contract remuneration should be set aside for an infant performing artist (Shields v Gross, 58 NY2d 338, 346 [1983]). Accordingly, this branch of the application is denied as insufficient.
Given the current posture of the parties, the court declares that the three petitioning young men are no longer members of the group for they have withdrawn from participation. This determination “shall not affect any right of action existing at the date of’ this ruling upon the application for revocation of approval (Arts and Cultural Affairs Law § 35.03 [2] [e]) and does not constitute a revocation of approval.
Moreover, given that these young men have refused to participate in the group and have neglected to make any constructive effort to achieve a resolution of the behavior they reportedly find objectionable, the court finds suspect their assertion that their “well-being * * * is being impaired” by the contract (Arts and Cultural Affairs Law § 35.03 [2] [e]). The charges *627 made against the Producer show all the signs of a creative attempt to avoid contractual obligations, in the same vein as the recently popular attempt to use bankruptcy proceedings to try to avoid a no longer desired executory personal services contract (see, In re Sammons, 210 BR 197 [ND Fla 1997] [proceeding filed in bad faith to avoid management contract]; Wald, Bankruptcy and Personal Services Contracts: What Works and What Doesn’t, and Why, 116 Banking LJ 605 [1999]). It adds no degree of comfort that, despite being challenged to do so, no explanation has been tendered justifying the presentation of the motion papers on the applicants’ behalf to the media, which resulted in the exposure to nonparties of references to and copies of papers which had been ordered sealed by the court order of September 8, 2000, consistent with Matter of Twentieth Century Fox Film Corp. (190 AD2d 483 [1st Dept 1993]). This conduct is a further sign that the applicants were attempting to create public pressure to achieve what they have been unable to gain by well-reasoned and legal argument, supported by carefully crafted proposals and documents ready for court approval.
Based upon the foregoing, it is declared that the three applicants are released prospectively from their obligations under the previously approved contracts. The balance of the requests for relief in the motion and cross motion are denied. To the extent that the court has not addressed any specific request for relief, such request is either rendered moot by the result reached or inadequately supported.
Although this decision is not sealed, all motion papers and exhibits shall be sealed and access restricted to the parties and their counsel absent specific order of the court.

. Jesse McCartney’s resignation was confirmed by several letters from an attorney representing him. His attorney’s most recent withdrawal letter was dated March 1, 2002, and was accepted by the Producer on March 26, 2002, prior to his mother’s execution of an affidavit on April 8, 2002, purporting to request that he be released from the agreements at issue. Because his resignation was repeatedly tendered and accepted, the court determines that there is a want of standing as to the request purportedly submitted on his behalf on the grounds raised. ■

. Because teenage music groups often have identified Internet addresses or domain names, it is noted that the same rules and principles may apply to Internet use of a group name (see, Yan, Virtual Reality: Can We Ride Trademark Law to Surf Cyberspace?, 10 Fordham Intell Prop Media & Ent LJ 773 [2000]; Hodgson, Registration and Ownership of Music Group Names in the Digital Age, 17 Ent & Sports Law 3 [Winter 2000]). In this case, for example, the Producer protested about a parallel Web site established for the group by one or more parents, but no action was requested in that regard.