**LLB REALTY, L.L.C., Appellant,**

v.

**CORE LABORATORIES, LP;
Core Laboratories, LLC.**

No. 03–4407.

United States Court of Appeals,
Third Circuit.

Argued Nov. 12, 2004.

Decided Feb. 9, 2005.

William D. Grand, Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, Woodbridge, NJ, for Appellant.

James M. Hirschhorn, Mark S. Olinsky, Sills, Cummis, Epstein & Gross, Newark, NJ, for Appellees.

Before McKEE and CHERTOFF, Circuit Judges, and BUCKWALTER, District Judge.*

## OPINION

McKEE, Circuit Judge.

We are asked to review the district court's dismissal of a suit for specific performance of a purported contract for the sale of a parcel of real estate.[1] For the reasons that follow, we will affirm.

### I.

This suit arises from protracted but failed negotiations between LLB Realty, L.L.C., and Core Laboratories, LP. For many years, Core has owned and occupied a parcel of commercial property in West Windsor, New Jersey. LLB became interested in purchasing that property because it abuts property LLB already owns. (Pa 5, Pa 154, Pa 249). In 1997, LLB contacted its real estate broker, Peter M. Dodds, and asked him to contact Core's then Sen-

---

* Honorable Ronald L. Buckwalter, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. It is not necessary to resolve Core's suggestion that the Sale and Purchase Agreement was merely an agreement to agree, and not a binding contract. Rather, for purposes of our discussion, we can assume *arguendo* that the signed agreement was intended to bind Core and LLB.

ior Vice President, Joseph Perna, to ascertain whether Core was interested in selling the parcel. (Pa 499).

Dodds and Perna conducted written and oral negotiations which eventually resulted in an Offer to Purchase and Standstill Agreement ("OPSA"), that both parties signed on January 23, 1998. (Pa 528, Pa 518, Pa 426–27). The OPSA memorialized a sale price and included a provision for a ten year leaseback arrangement the parties had negotiated as part of the consideration. However, the OPSA also provided that the parties would enter into a subsequent sale and purchase agreement within 60 days to allow for due diligence. (Pa 518–520). At the expiration of the "stand still period" provided in the OPSA, counsel for LLB mailed a draft Purchase and Sale Agreement to Core, and asked Core to inform LLB of the name of Core's counsel. (Pa 537). Two months later, in May 1998, Core's counsel returned a revised draft of the Purchase and Sale Agreement to LLB's attorneys. (Pa 593). Four days after receiving those revisions, LLB's counsel sent a 48–page first draft of a lease to Core. (Pa 646). Approximately three weeks later, LLB's counsel sent Core a draft agreement that incorporated nearly all of Core's proposed changes. (Pa 700).

Core's counsel never responded to that revised draft, and in July 1998, LLB learned that Core had decided not to go through with the deal for business reasons. (Pa 751). Core's decision not to sell was formally communicated to LLB in an exchange of letters between counsel in July and August of 1998. (Pa 750–54). That exchange concluded with a letter one of Core's attorneys sent to LLB on August 31, 1998. That letter explicitly rejected LLB's demands for assurances that Core intended to proceed with the sale and leaseback, and instead insisted that the OPSA was merely a non-binding preliminary agreement. (Pa 754).

Over the next two and one-half years, LLB did nothing to force Core to sell the land although Dodds did periodically contact Core's new Senior Vice President to inquire about Core's continued interest in selling the property. Each time, Core's Senior Vice President refused to sell. Those intermittent calls constituted the only contact between Core and LLB until January 2001, when Core told Dodds that Core was thinking about selling the property to a new prospective buyer, and offered LLB an opportunity to make another offer. However, Core made it clear that it would not entertain any offer that included a leaseback. (Pa 286–290).

LLB responded by retaining litigation counsel and, in February 2001, finally filed suit against Core. The suit requested specific performance of the real estate agreement and damages. LLB also filed a *lis pendens* on the property. (Pa 10–11). The district court subsequently dismissed LLB's suit and entered an order vacating the *lis pendens*. On October 30, 2003, the district court issued a permanent injunction discharging the *lis pendens* and enjoining LLB from filing any further *lis pendens* on the property. This appeal followed.

## II.

We have appellate jurisdiction to review the district court's injunction under 28 U.S.C. § 1292(a)(1). We also have jurisdiction to review the order dismissing LLB's action for specific performance because that dismissal is "inextricably linked" to the permanent injunction. *See Marshak v. Treadwell*, 240 F.3d 184, 190 (3d Cir.2001) ("[w]hen we have jurisdiction to review an order relating to an injunction under 28 U.S.C. § 1292(a)(1), our jurisdic-

tion extends to matters inextricably linked to the appealable order.").

## III.

Our review of the district court's legal conclusions, including its application of New Jersey law, is plenary. *See Snyder v. Pascack Valley Hospital,* 303 F.3d 271, 273 (3d Cir.2002). In reviewing the dismissal we must view the facts in the light most favorable to LLB (the non-moving party), and draw all reasonable inferences in LLB's favor.

We review the district court's denial of a request for the equitable remedy of specific performance for an abuse of discretion. *Stehr v. Sawyer,* 40 N.J. 352, 192 A.2d 569, 570 (1963). We uphold the district court's exercise of discretion if it is consistent with the substantive law of New Jersey, and is not "arbitrary, fanciful, or unreasonable" or based on improper standards, criteria, or procedures. *Buchanan v. Evans,* 555 F.2d 373, 378 (3d Cir.1977). Under New Jersey law, we must view the trial court's ruling on specific performance with deference, as "evaluation of the equities in these cases must be left largely to the judgment and good conscience of the trial court." *Stehr,* 192 A.2d at 171.

## III.

LLB argues that since Core was not prejudiced by LLB's two and one-half year delay in suing for specific performance, the district court erred in concluding that suit was barred by the defense of laches. According to LLB, laches can not bar an action for specific performance under New Jersey law absent a showing that the delay has prejudiced the defendant. *See* Appellant's Br. at 24. In a related argument, LLB claims that the district court's concern for enforcing an agreement that would have forced LLB and Core into a ten year leaseback was not justified be-

cause the court had the inherent equitable power to "mold" the agreement to achieve an equitable remedy. *Id.* at 32.

In *Stamato v. Agamie,* 24 N.J. 309, 131 A.2d 745, 749 (1957), the Supreme Court of the State of New Jersey stated:

> There is no precise formula for determining when equity will grant specific performance to one who fails to meet the time provisions of his contract. . . . Rather the general rule is that he who seeks performance of a contract for the conveyance of land must show himself ready, desirous, prompt, and eager to perform the contract on his part.

(internal quotation marks omitted).

The rule of *Stamato* was more recently relied upon as an additional basis for the decision in *Ridge Chevrolet–Oldsmobile, Inc. v. Scarano,* 238 N.J.Super. 149, 569 A.2d 296, 300 (1990). Clearly, we can not conclude that the district court abused its discretion in finding that, given this delay, LLB had not shown itself to be "ready, . . . prompt, and eager to perform the contract . . ." as required under New Jersey law.

Moreover, we have already noted that specific performance is an equitable remedy. The "validity of the defence *(sic)* [of delay] must be tried upon principles substantially equitable." *Lavin v. Board of Educ.,* 90 N.J. 145, 447 A.2d 516, 519 (1982). Accordingly, there is another reason to affirm the denial of specific performance here.

New Jersey acknowledges the general rule that "[e]quity will not ordinarily order specific performance where the duty to be enforced continues over a long time and is difficult of supervision." *Dover Shopping Ctr., Inc. v. Cushman's Sons,* 63 N.J.Super. 384, 164 A.2d 785, 791 (1960). Core's new Senior Vice President testified that he did not think leasebacks of real estate

were in Core's best interests. Enforcing a ten year leaseback would therefore have required the court to create a business relationship that was contrary to the wishes of Core's senior management. It would also have forced hostile parties into a lengthy and antagonistic lease agreement that would have been viewed as oppressive and required long-term supervision. The district court wisely refused to do so, and the fact that it did not factor Core's prejudice into that equation does not transform its decision into an abuse of discretion.

It is obvious from the history of the negotiation of the OPSA that the final sales price was contingent upon, and closely related to, the structure of the leaseback. Therefore, the court could not simply "mold" the agreement by forcing Core to sell the property without a leaseback as LLB suggests. *See* Appellant's Br. at 32. Although courts have broad discretion in shaping equity decrees, they will not make a different contract for the parties in an effort to enforce the contract the parties actually agreed upon. *See e.g. Michele Matthews, Inc. v. Kroll & Trust*, 275 N.J.Super. 101, 645 A.2d 798, 802 (1994), *Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973). Specific performance of the contract without the leaseback provision, would have required a revaluation of the sale price. LLB seeks to minimize this by suggesting that the court could simply order the sale and award Core damages for the revenue stream Core would lose by not having income from a leaseback. However, that revenue stream was to flow over a period of ten years and the court had no way knowing the price Core would have initial-

ly set for the sale (or the price LLB would have been willing to pay) absent the subsequent leaseback. Thus, LLB's suggestion would require the district court to negotiate a different real estate transaction for the parties rather than enforce the one they agreed upon.

### IV.

For the reasons stated above, we find that the district court properly refused to grant specific performance to LLB. Accordingly, we will affirm the order of the district court.[2]

---

**2.** We need not separately address LLB's request for damages because the district court's denial of equitable relief precludes any recovery of damages. "[A] right to damages can-

not exist when plaintiff's conduct is such as to foreclose relief under the liberal approach of equity." *Stamato*, 131 A.2d at 749.