THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
21 April 2008
AD

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

General Motors Corp.
v.
Aristide & Co., Antiquaire de Marques

_____

Opposition No. 91167007
to application Serial No. 79005477

_____

Timothy G. Gorbatoff, Esq. for General Motors Corp.

Aristide & Co., Antiquaire de Marques, pro se.[1]

_____

Before Seeherman, Drost, and Taylor, Administrative
Trademark Judges.

Opinion by Drost, Administrative Trademark Judge:

On June 7, 2004, applicant's (Aristide & Co.,
Antiquaire de Marques) request for extension of protection
under the provision of Section 66(a) of the Trademark Act
(15 U.S.C. § 1144f(a)) was received by the U.S. Patent and
Trademark Office to register the mark LA SALLE in standard
character form for "Motor vehicles, namely automobiles,

---

[1] The only paper that applicant filed is the answer. The answer
was signed by applicant's manager, Julien Clairet.

boats, motorcycles; car bodies; automobile chassis; engines

and other parts for motor vehicles, namely axles, drive

gears, transmissions; motor buses; recreational vehicles,

namely campers; motor coaches; bicycles; lorries, namely

light lorries, transportation lorries; vans, namely

caravans; motorcycles; tractors; mopeds" in Class 12.

Serial No. 79005477.  The application supplies a translation

of the mark as "the room."

　　After the mark was published for opposition, General

Motors Corp. (opposer) filed an opposition on October 17,

2005.  In its opposition (p. 2), opposer alleges that:

> 4. Beginning in 1927, Opposer, through its Cadillac
> Motor Car Division, introduced a highly acclaimed
> vehicle bearing the LASALLE trademark.  Opposer
> continuously manufactured, distributed and sold the
> LASALLE vehicle until at least 1940.
>
> 5. While no longer in production, Opposer's LASALLE
> vehicle has remained popular with enthusiast[s] and
> consumers throughout the world and, in particular, the
> United States, and continues to be associated in the
> minds of such enthusiasts and consumers with Opposer
> and its Cadillac Motor Car Division.
>
> 6. Given the continued popularity of Opposer's LASALLE
> vehicle, Opposer has: (1) continued to supply, directly
> or through licensees, a variety of parts used in
> connection with restoration of LASALLE vehicles; and
> (ii) licensed use of the LASALLE trademark to third
> parties in connection with a variety of goods.
> Opposer's continued sales and licensing of such goods
> further exemplifies the trade and public's continued
> association of the LASALLE mark with high-quality
> products originating from Opposer and its authorized
> licensees.
>
> 7. Furthermore, while the Opposer has not sold a
> LASALLE vehicle in the United States since in or about
> 1940, it has not abandoned its interest in using the

2

LASALLE mark.  Reintroduction of historic, popular brands is a common practice in the automotive industry and Opposer has considered the reintroduction of the LASALLE mark on numerous occasions since 1946.

Opposer alleges that applicant's mark is likely to cause confusion with opposer's mark as well as dilution.

In its answer, applicant denied that opposer would be damaged by the registration of its mark.  Specifically, applicant maintains (answer at 2-3) that:

> So the Opposer states several times that for 65 years now no "LASALLE" vehicle has been commercialised in the United States.  65 years is more than two whole generations.  That means that in an average family nobody can remember a LASALLE car except the grand father or the grand mother.  During these last 65 years without commercialisation of LASALLE vehicle[s] a lot of events occurred in the United States.  Events concerning the automobile industry and events about the IP legislation and Trademarks in particular.  If the Opposer does not own a LASALLE trademark and if he is not selling any LASALLE vehicle for 65 years, one can wonder if this notice of opposition can be regarded as relevant…
>
> The Opposer mentions the "*continued popularity of LASALLE vehicle*" (§ 6), but without commercialisation of LASALLE vehicles since 1940 one can wonder on the reasons of this popularity.  And one can wonder also on how LASALLE had been continuously popular without commercialisation for the last 60 years.  Especially since the Opposer delivers no proof of such popularity in its notice of opposition…
>
> Since the Applicant has not been able to encounter a "trademark LASALLE" prior to his filing in 2004, the Applicant would like to know which "trademark LASALLE" the Opposer is mentioning.  If the Opposer has no ownership on a "trademark LASALLE" for several decades one can wonder how the Opposer could have licensed this trademark…
>
> The Opposer does not bring any proof about such current use of LASALLE products.  Without any document clearly mentioning real production of LASALLE parts (with

3

description of quantities/ year of production/ description of items sold) from Opposer, this argument seems totally ineffective. On top of the production of parts, documents concerning the distribution of the parts could be really important (with quantities/ location of distribution).

### The Record

The record includes the file of the involved application; the testimony deposition of Gary S. Skelton, the licensing manager for GM Service Parts Operation of Equity Management Inc., with exhibits; and the testimony deposition of Gene Reamer, opposer's manager of trademark licensing, with exhibits. Both depositions have been marked confidential, which will limit our reference to them. However, in order to render a decision that relates to the relevant facts of this case, we have referred to selective portions of the record that appear to us to be not truly confidential.

Applicant has not submitted any evidence or a responsive brief.

### Standing

A party has standing to oppose within the meaning of § 13 if that party can demonstrate a "real interest" in the proceeding. *Universal Oil Products Co. v. Rexall Drug and Chemical Co.*, 463 F.2d 1122, 174 USPQ 458, 460 (1972). *See also Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982). In its pleading, opposer has alleged that it is the owner of the mark LASALLE

4

for vehicles, which it used until 1940.  It has submitted testimony and exhibits that show that it used the mark LASALLE for vehicles until 1940, and that it presently licenses the mark LASALLE.  This evidence establishes that opposer has an interest in this proceeding beyond that of the general public and, therefore, opposer has standing.

Priority

A critical issue in an opposition proceeding concerning whether there is a likelihood of confusion is the question of which party has priority.  We begin by looking at applicant's priority date.  Inasmuch as it did not submit any evidence, its priority date is determined by its application.  Applicant can rely on the filing date of its U.S. application, which is June 7, 2004.  *Zirco Corp. v. American Telephone and Telegraph Co.*, 21 USPQ2d 1542, 1544 (TTAB 1991) ("[T]here can be no doubt but that the right to rely upon the constructive use date comes into existence with the filing of the intent-to-use application and that an intent-to-use applicant can rely upon this date in an opposition brought by a third party asserting common law rights.").  Furthermore, since its application is actually an extension of protection under Section 66(a), it can rely on its international filing date as its priority date. Trademark Act § 67 (15 U.S.C. §1141g):

> The holder of an international registration with a request for an extension of protection to the United

5

States shall be entitled to claim a date of priority based on a right of priority within the meaning of Article 4 of the Paris Convention for the Protection of Industrial Property if—

(1) the request for extension of protection contains a claim of priority; and

(2) the date of international registration or the date of the recordal of the request for extension of protection to the United States is not later than 6 months after the date of the first regular national filing (within the meaning of Article 4(A)(3) of the Paris Convention for the Protection of Industrial Property) or a subsequent application (within the meaning of Article 4(C)(4) of the Paris Convention for the Protection of Industrial Property).

Applicant's priority date is, therefore, December 15, 2003.

Now we must determine whether opposer has used its mark prior to applicant's priority date of December 15, 2003. Since opposer is not claiming ownership of a federal registration, it must show that it has common law rights prior to applicant's priority date. *Hydro-Dynamics Inc. v. George Putnam & Company Inc.*, 811 F.2d 1470, 1 USPQ2d 1772, 1773 (Fed. Cir. 1987) (The "decision as to priority is made in accordance with the preponderance of the evidence").

We now look at the evidence of opposer's use. Because we are mindful that the depositions have been designated as confidential, we will refer to the evidence, as much as possible, as opposer discusses it in its non-confidential brief. Opposer's LASALLE vehicle was produced between 1927 and 1940. Brief at 2-3; Reamer dep. at 51. Obviously, if opposer has used the mark since that time, opposer would

6

have priority. However, in its notice of opposition (p. 2), opposer acknowledges that it has not "sold a LASALLE vehicle in the United States since in or about 1940." *See also* Brief at 3. The notice of opposition only refers to opposer supplying parts for the restoration of LASALLE vehicles and the use of the LASALLE trademark in connection with a variety of unspecified goods. Notice of Opposition at 2. Applicant, in its answer, questions opposer's "lack of use of LASALLE vehicles for 65 years" and specifically points out that opposer did not "bring any proof about such current use of LASALLE products." Answer at 2-3. Opposer's admission that it has not produced any vehicles with the LASALLE trademark since 1940 and applicant's arguments in its answer raise the issue of whether opposer has abandoned its LASALLE mark. The Trademark Act specifically establishes that "[n]onuse for 3 consecutive years shall be prima facie evidence of abandonment." 15 U.S.C. § 1127.[2] Introduction of evidence of nonuse of the mark for three consecutive years constitutes a prima facie showing of abandonment and shifts the burden to the party contesting the abandonment to show either evidence to disprove the underlying facts triggering the presumption of three years

---

[2] The statutory presumption of abandonment applies "to a party's unregistered common-law mark." *Miller Brewing Company v. Oland's Breweries [1971] Limited*, 548 F.2d 349, 192 USPQ 266, 267 (CCPA 1976).

nonuse, or evidence of an intent to resume use to disprove the presumed fact of no intent to resume use. *Imperial Tobacco Ltd. v. Philip Morris Inc.*, 899 F.2d 1575, 14 USPQ2d 1390, 1393 (Fed. Cir. 1990) ("Philip Morris proved that Imperial did not use the mark JPS for cigarettes in the United States for more than two years immediately preceding the filing of its petition for cancellation. Such proof established a prima facie case of abandonment of the JPS mark under section 45(a), including the element of intent")[3]; *Rivard v. Linville*, 133 F.3d 1446, 45 USPQ2d 1374 (Fed. Cir. 1998) ("This presumption shifts the burden to the registrant to produce evidence that he either used the mark during the statutory period or intended to resume or commence use").

Opposer's nonuse on automobiles is in excess of sixty years. Indeed, opposer does not offer any evidence or explanation for its nonuse between 1940 and the early 1990's. It has not shown that it has used its LASALLE mark on any goods during this period nor has it provided any explanation for its plans to resume use of this particular mark on vehicles. "Use" of a mark means "the bona fide use of such mark made in the ordinary course of trade, and not

---

[3] This case was decided prior to the amendment of the Trademark Act, when two years of nonuse was sufficient to establish a prima facie case of abandonment. The Act now provides that a prima facie case is established by three years of nonuse.

made merely to reserve a right in a mark." 15 U.S.C.

§ 1127. Merely because a party has used a mark a long time

ago and it could use the mark in the future is not enough to

avoid abandonment. *Silverman v. CBS Inc.*, 870 F.2d 40, 9

USPQ2d 1778, 1783 (2d Cir. 1989) (citations omitted):

> A proprietor who temporarily suspends use of [a] mark
> can rebut the presumption of abandonment by showing
> reasonable grounds for the suspension and plans to
> resume use in the reasonably foreseeable future when
> the conditions requiring suspension abate. But a
> proprietor may not protect a mark if he discontinues
> using it for more than 20 years and has no plans to use
> or permit its use in the reasonably foreseeable future.
> A bare assertion of possible future use is not enough.

While opposer argues that its LASALLE model was "a

highly acclaimed vehicle" (Brief at 2), the evidence does

not permit us to draw that conclusion. Also, opposer argues

that "while the Opposer has not sold a LASALLE vehicle in

the United States since in or about 1940, it has not

abandoned its interest in using the LASALLE mark.

Reintroduction of historic, popular brands is a common

practice in the automotive industry." Brief at 5. In

support of these arguments, opposer submitted a printout

from a "Cadillac & LaSalle Club."[4] The club's website

specifically says that it "is not affiliated with General

Motors Corporation but maintains a cooperative relationship

with Cadillac nationally and numerous Cadillac dealers

locally." Opposer also included several pages of Google

---

[4] www.cadillaclasalleclub.com

9

search results for the search "Cadillac Lasalle." Truncated results from search engines are entitled to little weight. *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 82 USPQ2d 1828, 1833 (Fed. Cir. 2007):

> Bayer asserts that the list of GOOGLE search result summaries is of lesser probative value than evidence that provides the context within which a term is used. We agree. Search engine results—which provide little context to discern how a term is actually used on the webpage that can be accessed through the search result link—may be insufficient to determine the nature of the use of a term or the relevance of the search results to registration considerations.

Opposer's witness also discussed evidence concerning the reintroduction of the THUNDERBIRD brand after about a ten-year hiatus, the MALIBU brand after a fourteen-year hiatus, and the GTO and CHARGER brands after approximately a thirty-year hiatus. Brief at 5; Reamer dep. at 51-57 and exhibits 61-64. However, opposer's witnesses did not testify about any specific plans to reintroduce the LASALLE name on vehicles. The fact that brands in the automobile industry are sometimes re-introduced does not exempt the industry in toto from the normal statutory presumption that trademarks can become abandoned and that trademark owners must have an intent to resume use and an explanation for any nonuse. Even if its witness had testified unequivocally that opposer did not intend to abandon the LASALLE mark, that would not by itself show that opposer did not abandon its mark prior to 1990. *Rivard*, 45 USPQ2d at 1376 ("A

10

registrant's proclamations of his intent to resume or commence use in United States commerce during the period of nonuse are awarded little, if any, weight."). Opposer has not submitted any evidence that convinces us that, after a sixty-five year hiatus, it has any serious intent to reintroduce a LASALLE vehicle that was last marketed prior to America's involvement in World War II.

Furthermore, while not expressly argued, we do not find that there is residual goodwill in the LASALLE trademark. Opposer's evidence that there are some car collector clubs that also collect LASALLE vehicles and that *other* car brands have been reintroduced is not very significant evidence. For example, residual goodwill is not sufficient to avoid a finding of abandonment where the goodwill is generated through subsequent sales of a product by distributors or retailers. *Societe des Produits Marnier Lapostolle v. Distillerie Moccia S.R.L.*, 10 USPQ2d 1241, 1244 n. 5 (TTAB 1989). Also, the simple fact that there are collectors of an item does not, by itself, defeat the statutory presumption of abandonment by the mark's owner after three years of nonuse in the ordinary course of trade.

Opposer's nonuse of the mark for more than three years after 1940 constitutes a prima facie showing of abandonment. Furthermore, opposer has not submitted evidence of an intent to resume use to disprove the presumption of no intent to

resume use.  Because we hold that opposer abandoned its

mark, we now look to opposer's licensing of its mark

beginning in the 1990s to see if opposer has established a

new priority date.  *AmBRIT Inc. v. Kraft Inc.*, 812 F.2d

1531, 1 USPQ2d 1161, 1170 (11th Cir. 1986) ("Isaly contends

that Kraft's nonuse between 1932 and 1980 caused the mark to

be abandoned and Kraft's registration to be void.  Isaly

asserts that Kraft's subsequent use beginning in 1980 does

not retroactively cure its past abandonment.  We agree").

Licensing activity may indicate that a trademark owner

has not abandoned its mark because it intends to resume use.

*See Sands, Taylor & Wood Co. v. The Quaker Oats Co.*, 978

F.2d 947, 24 USPQ2d 1001, 1009 (7th Cir. 1992) ("Although

the district court erred in focusing on the intent of STW

rather than of Karp during the three years that Karp owned

the marks, the court at least implicitly found that Karp's

efforts to license THIRST-AID to Shasta and Tropicana were

sufficient to establish Karp's intent to resume use.  Karp

did not abandon the right to use THIRST-AID for a beverage")

(footnotes omitted).  In the present case, we have found

that opposer abandoned its mark long before it began

licensing its mark.  The question now is whether its

licensing evidence has established a new priority date for

opposer.  *See Stromgren Supports Inc. v. Bike Athletic Co.*,

43 USPQ2d 1100, 1112 (TTAB 1997) ("[T]hese later efforts,

had actual use ever commenced, would represent a new and separate use which cannot serve to cure the abandonment").

To show its priority, opposer has submitted evidence of numerous licenses regarding its LASALLE mark.  A trademark owner can rely on the use of a licensee for its priority.

> [T]he Trademark Board in 1981 expressly overruled prior inconsistent decisions and held that rights to a mark can be acquired and maintained through use of a mark by a controlled licensee even when the only use of the mark has been made by the licensee.  PTO policy expressly permits an application by a party who claims use of the mark through a licensee.

McCarthy, *Trademarks and Unfair Competition*, § 18:46 (2008) (footnote omitted).

Opposer has submitted two types of licensing evidence of the mark LASALLE.  The first concerns vehicle parts.  Opposer points to a series of license agreements it entered into with various manufacturers.  Skelton Exhibits 1-5 are license agreements with one company for clutch and brake pedals and monogram running board inserts.  These agreements also license four other GM trademarks for a series of products.  Skelton Exhibit 6 is a license agreement for custom fitted vehicle mats.  The agreement includes the LASALLE mark among more than ninety other trademarks that are licensed.  Opposer describes these licenses, and the record supports this description, as follows:

> Opposer has engaged in licensing use of its LASALLE trademark since at least as early as 1993 in connection [with] motor vehicle parts, used in the restoration of

13

LASALLE vehicles, for distribution and sale in the United States, including the following:

(i) clutch and brake pedals, monogram running board inserts

(ii) custom fitted vehicle mats; and

(iii) leaf springs.

Brief at 3 (citations omitted); Skelton dep. 8-26 and Exhibits 1-9.

However, opposer admits that: "While the licensed leaf springs were expressly intended for use in connection with Opposer's LASALLE motor vehicles, the leaf springs themselves do not bear any trademarks. Opposer licensed use of the GM Restoration Parts Emblem for use by the licensee to assure customers of Opposer's endorsement of use of the licensed leaf springs in connection with its LASALLE motor vehicles." Brief at 3 n.2. Regarding opposer's sale of replacement parts, its witness testified as follows:

Q. … Mr. Skelton, do all of the parts licensed under that program necessarily bear the trademarks of the vehicles for which those parts were made?

A. No.

Q. But the GM restoration parts emblem is used I think you mentioned earlier, and I might be paraphrasing here, to – I guess why don't I ask you for the purpose of a consumer, what would be the benefit of having a GM restoration parts emblem appearing on the product?

A. Well, what the GM restoration emblem represents is that GM has endorsed the product or approved the product that they are buying. It could either have a trademark or nontrademark. In the instance with

14

[Company A] or [Company B][5], the application that they are making is for LaSalle, but it doesn't have any kind of trademark on it, but it's the application. What they are trying to do is they are selling it and being endorsed by General Motors that they do carry something for General Motors vehicles.

Q. So, for a customer who is interested in buying a restoration part for their LaSalle vehicle, it would be valuable to them to know that the part that they were getting was endorsed by General Motors?

A. Yes.

Q. Because General Motors was the manufacturer of the LaSalle vehicle?

A. General Motors was – yes, was the manufacturer of the LaSalle and they have looked at the specs and everything.

Skelton dep. at 25-26.

Here, it looks as if opposer may have three products to which it might have affixed its LASALLE trademark, the monogram running boards, pedals, and custom fitted floor mats. The problem we have with this argument for opposer's priority date is that while opposer has submitted evidence that it has licensed the LASALLE mark along with other marks, it has not presented any evidence that it or its licensees actually sold any vehicle parts with the LASALLE trademark. Licensing is not by itself use of the mark. Opposer's witness testified that he saw "the products" of one of the licensees at a "couple of different shows. I've

---

[5] Because the testimony has been marked confidential we have deleted the reference to the specific companies. The information concerning parts that are intended to be sold to the public does not appear to be confidential.

been to the Carlisle show and the Charlotte show [and] they have a booth or trailer and they have their products displayed there. I've also seen it in the catalogs that they've produced out there for display." Skelton dep. at 27. Inasmuch as that licensee was licensed to use several trademarks in addition to the LASALLE mark, it is not clear from this testimony whether the witness actually saw LASALLE brand products. Even if we could assume from this testimony that there could have been use of the LASALLE mark on some goods, there is no information about the number of items bearing the mark that were made or sold. Thus, we have no basis to assume that, even if there was actual use, it was more than token use. *Westrex Corp. v. New Sensor Corp*., 83 USPQ2d 1215, 1219 (TTAB 2007) ("[A] mere token sale or shipment of the goods does not constitute 'use' under the Trademark Act").

The second type of licensing that opposer has submitted consists of its licensing for a wide variety of consumer products. In its brief (pp. 3-5 (footnote omitted)), opposer argues and points to the following evidence to describe its other licensing activities.

> As further evidence of the continued popularity of Opposer's LASALLE mark, since at least as early as 2001, Opposer has licensed use of the LASALLE trademark to third parties in connection with a wide variety of consumer-related merchandise for distribution for sale in the United States, including the following:

16

(i) screen printed T-shirts and sweatshirts (Reamer Tr. 8-17, GM 12-15);
(ii) collector steins made of ceramic and/or porcelain (Reamer Tr. 14-16, GM Ex. 16);
(iii) baseball caps, visors, bucket hats and knit caps (Reamer Tr. 16-20, GM. 17-18);
(iv) calendars, postcards and postcard books (Reamer Tr. 20-24, GM Ex. 19-22);
(v) jackets, polo shirts, sweatshirts, hats, T-shirts, vinyl and canvas bags, bowling shirts (Reamer Tr. 24-26, GM Ex. 23-24);
(vi) posters (Reamer Tr. 26-28, GM Ex. 25-28);
(vii) books (Reamer Tr. 29, GM Ex. 29);
(viii) metal signs (Reamer Tr. 30-32, GM Ex. 30-32);
(ix) holiday ornaments, water globes, table piece figurines (Reamer Tr. 32-33, GM Ex. 33-34);
(x) signs, magnets, vehicle replica models, key chain racks, coat racks, thermometers, chalkboards, menu boards, jumbo pencils, votive candleholders, sun catchers, nightlights (Reamer Tr. 34-35, GM Ex. 35-36);
(xi) shirts, ladies blouses, dresses, pants, skirts, walking and boxer shorts, swimwear, robes (Reamer Tr. 35-37, GM Ex. 37-39);
(xii) metal signs and cards (Reamer Tr. 37-38, GM Ex. 40-41);
(xiii) die cast vehicle replicas, T-shirts, jackets, shorts, caps, ponchos, pens and pencils, markers, plastic signs, bumper stickers, golf balls and baseballs, magnets, lighters, air fresheners, fanny packs, automobile sunshades, Christmas ornaments, seat cushions, trailer hitch covers and fan banners (Reamer Tr. 38-43, GM Ex. 42-49); and
(xiv) die cast vehicle replicas, collector plates, trading cards (Reamer Tr. 43-50, GM Ex. 50-60).

Each of the license agreements referenced above was entered into *prior* to Applicant's filing of Application Serial No. 79/005477 or its priority date of December 15, 2003, and continues to remain valid and existing at least as of the filing of the Notice of Opposition. Opposer's licensing of such goods further exemplifies the trade and public's continued association of the LASALLE mark with high-quality products originating from Opposer and its authorized licensees.

There are several problems with these license agreements as evidence of opposer's priority. First, opposer has not submitted any evidence that it has actually

17

used the LASALLE mark on the licensed goods.  For example, Reamer exhibit 12 is a license for at least fifty trademarks.  Exhibit 13 is an amendment that adds more than twenty additional trademarks including LASALLE.  We cannot conclude, without any supporting testimony or documents, that every trademark licensed was in fact used on the goods or that one particular trademark (LASALLE) on this list was in fact used.  For example, the license covers several types of clothing items.  However, in its brief opposer discusses only two products (T-shirts and sweatshirts).  In short, it is simply unclear whether or when and on what goods opposer's LASALLE mark has actually been used.

Furthermore, even if the LASALLE mark was used, we have no indication as to the volume of sales.  As we discussed previously with the LASALLE vehicle parts, even if there was evidence of actual use, these sales would have to be more than token sales.

Finally, as opposer acknowledges, these licenses did not begin until 2001.  Indeed, some of the relevant licenses were actually executed fairly close to applicant's priority date.  Thus, even if the licensee did eventually commercially market LASALLE licensed products, we have no evidence that these transactions occurred prior to applicant's priority date.  We also note that this case is different from the facts in *Ferrari S.p.A. Esercizio*

18

*Fabbriche Automobili e Corse v. McBurnie*, 11 USPQ2d 1843 (S.D. Cal. 1989) and *American Motors Corp. v. Action-Age, Inc.*, 178 USPQ 377 (TTAB 1973). The first case involved the copying of the design of a Ferrari Daytona Spyder sports car by a car kit manufacturer. The Court found that "there has been continuous commercial use of the DAYTONA design trade dress." 11 USPQ2d at 1849. In the second case, the mark RAMBLER had been discontinued only a few years earlier and American Motors continued to supply "'RAMBLER' parts and accessories to owners of these vehicles" and its dealers continued to use RAMBLER signs on their premises and as part of their corporate or business names. 178 USPQ at 378.

As the opposer in this proceeding, opposer needs only to show that it is using the mark in the United States, not necessarily that the use was in commerce, prior to applicant's priority date. *First Niagara Insurance Brokers Inc. v. First Niagara Financial Group Inc*., 476 F.3d 867, 81 USPQ2d 1375, 1378 (Fed. Cir. 2007 ("In the proceedings below, the Board based its analysis on the assumption that an 'opposer's claim of prior use can succeed only if it has proved use of its marks in connection with services rendered in commerce lawfully regulated by Congress, as required under Section 45 of the Trademark Act, 15 U.S.C. §1127.' Such an assumption was unwarranted, however, in light of the plain language of the statute, which merely requires the

prior mark to have been 'used in the United States by another.'  15 U.S.C. §1052(d)") (citation to record omitted).  Here, the only evidence we have of opposer's use subsequent to 1990 is the testimony of its witnesses concerning its confidential license agreements.  The fact that opposer has licensed its LASALLE mark along with dozens of other marks for a variety of products does not demonstrate that it has, either directly or through its licensees, actually used the LASALLE mark on any of those licensed products before applicant's priority date.

We add that we have looked not only at each piece of evidence individually but we have also considered all the evidence as a whole and what it tells us about opposer's use.  *West Florida Seafood Inc. v. Jet Restaurants Inc.*, 31 F.3d 1122, 31 USPQ2d 1660, 1663 (Fed. Cir. 1994) ("The TTAB concluded that each piece of evidence individually failed to establish prior use.  However, whether a particular piece of evidence by itself establishes prior use is not necessarily dispositive as to whether a party has established prior use by a preponderance.  Rather, one should look at the evidence as a whole, as if each piece of evidence were part of a puzzle which, when fitted together, establishes prior use").  The evidence, even when taken as a whole, shows that opposer stopped using its LASALLE mark in 1940.  Subsequently, opposer licensed the LASALLE mark along with dozens, if not

20

hundreds, of other marks, but it has not demonstrated that it actually used the mark on any goods prior to applicant's priority date.

"Opposer, as plaintiff in the opposition proceeding, bears the burden of proving, by a preponderance of the evidence, its asserted grounds of (i) priority and likelihood of confusion and (ii) dilution." *Genesco Inc. v. Martz*, 66 USPQ2d 1260, 1257 (TTAB 2003). *See also Eastman Kodak Co. v. Bell & Howell Document Management Products Co.*, 994 F.2d 1569, 26 USPQ2d 1912, 1918 (Fed. Cir. 1993) ("[T]he challenger's burden of proof in both opposition and cancellation proceedings is a preponderance of the evidence"). We conclude that opposer has failed to prove priority of use of the LASALLE mark subsequent to its abandonment of the mark over 65 years ago. We also find that the evidence of record meets the applicant's burden of proving abandonment by a preponderance of the evidence. *Online Careline Inc. v. America Online Inc.*, 229 F.3d 1080, 56 USPQ2d 1471, 1476 (Fed. Cir. 2000) (registered mark); *Marshak v. Treadwell*, 240 F.3d 184, 57 USPQ2d 1764, 1774 (3d Cir. 2001) (abandonment of common law mark).

We conclude that opposer's LASALLE mark was abandoned for a period of at least three years after 1940. Opposer has neither shown that it had an intent to resume use nor established a subsequent priority date. Therefore, opposer

21

cannot prevail in this opposition because it has not established a date of priority before applicant's priority date.[6]

 Decision: The opposition is dismissed.

---

[6] Because opposer has not shown that it has priority for any particular goods, we do not address its claims of likelihood of confusion and dilution.